Our next case this morning is number 20-1567, Thomas Bellis v. Wilkes Barre Area School District. Counsel for the appellant will go first, but do you want to reserve some time for rebuttal? We can't hear you, sir. All right. I'm sorry, we still can't hear you. Okay, now we can. All right. Would you like to reserve some time for rebuttal? Yes, Your Honor, I'd like to reserve two minutes. Okay, that'll be granted. I'll be keeping time. I'd suggest you do so as well, and you may start when you're ready. One moment. Thank you very much. May it please the court, I am Kim Borland, and I represent the plaintiff appellant, Thomas Bellis. And I understand, of course, that the court has read the briefs, understands the core issues. I want to begin my argument by pointing out that the real issue here is that Judge Mihalchik made at least eight material inferences in favor of the defendants in this case in determining this motion. And it is a core principle of the standard of review of a motion for assembly judgment that inferences should not be drawn in favor of the moving party for such a motion. The first inference that I want to draw your attention to, redraw your attention to, is her inference that the appointment on August 11, 2014, of a co-coach for Mr. Bellis cannot constitute an adverse employment action, and that no reasonably objective juror would find, as a matter of law, that such an appointment would amount to an adverse employment action or would be a negative to that coach. On this particular point, help me with a couple of things, because it seems to me that the key to your retaliation claim is the demotion and the adverse employment action as they sort of work together to see whether you can survive summary judgment. So tell me, if you would, what does an associate coach mean? It seems from the record that it's a co-head coach, but in order for it to be a demotion, as you assert, were there any diminution in benefits? Is that in the record? Yes. Well, there were not diminution in benefits. The pay was going to remain the same, but Mr. Parsnick was going to receive the same salary as a co-head coach as Mr. Bellis. That's the issue with respect to benefits, but the authority and the responsibility was diminished by virtue of the fact that it was no longer singular, and it was now shared mutually by all definitions of co-coach, and that, of course, is what Mr. Proffitt, who became an assistant coach, also said, that this was a co-coach. And in any circumstance, when one person has singular authority and singular responsibility for decision-making, and another person is brought to the same level, that is necessarily a reduction, a significant reduction, in the authority and value of that position. And we did argue in our reply brief, by analogy to the Family Medical Leave Act, if someone had gone on leave and had been the chief executive officer of a company and comes back from leave and he now finds himself as a co-chief executive officer of that company, that would be a violation of the FMLA. And that's an analogous argument. Right, I get that, but let's focus on the second part, which is the adverse employment action. So, I understand your position on demotion, but we know that adverse employment action requires serious and tangible enough to alter the employee's compensation terms, conditions, or privileges of employment. So, the diminution in responsibilities satisfies that serious and tangible requirement? Every one of those elements, because it's disjunctive and not conjunctive, every one of the last three elements are substantially reduced. I mean, in the world of scholastic sports, being a head coach, a head varsity coach, is a significant position, an honor, and it carries with it great weight in the community to within 100 or so days of the appointment, less than 100 days of the appointment, to be removed from that status is a very significant reduction in that coach's authority. Leaving, obviously, no ability to singularly maintain the program, make the decisions, and operate it, especially due to the fact that at the same time that Mr. Parsnick was appointed, so were the assistants who had, one of whom, of course, Mr. Hawkins, had spoken out against Mr. Bellis' appointment in June on account of his inability to use his hands to manually write the wrestling scorebooks in public at a school board meeting in front of all the school board members who heard that. So, combined with the fact that the assistants were aligned with the new co-coach, it certainly had a tremendously adverse impact on Mr. Bellis. Is Hawkins a decision maker? Hawkins is not a decision maker, but Hawkins spoke to the board, which is what brings the board into this, because Hawkins spoke at a public board meeting and complained about the appointment of Mr. Bellis and used disability terms. Well, I get that, but there were students who complained, apparently, there were parents who complained, and Hawkins is not a decision maker. But let me ask you this question as it relates to the reasonable accommodations claim, and this one as well, because you said he was removed. The evidence before us is that he submitted a letter of recommendation, and there's evidence that the school board, at the time, or on the day that he informed them that he was going to resign, was at the very same time investigating the installation of a lift. What effect does that have on the reasonable accommodations claim? Well, what is uncontested in the evidence is that Mr. Bellis was unaware of any steps that the district had taken to explore that. So, he did not know that on the morning of August 28th. That's concerning, counsel. I mean, I get your point, but I mean, just because he didn't know doesn't mean they were trying to reasonably accommodate him. I'm a little confused by that. What's the significance of it? I'm sorry, Ron. I just want to know what the significance is, counsel. I mean, you know, you're saying they didn't reasonably accommodate me, but, well, I just didn't know they were trying to reasonably accommodate me. So, you know, is this knowledge legally significant? The reason it's significant is because of the other evidence that creates the context. In late May or June, the evidence is that the superintendent, Bernard Pravuznak, had said to, in a meeting with Mr. Castano and the assistant superintendent Costello, said to Mr. Bellis that they were never going to put a lift in. And he specifically said, on behalf of the board, representing that he had the board's authority, that the board would never pay for a lift to get to that wrestling room. So after that, you know, he had asked for four accommodations, any one of four, and he didn't, none of them were lines in the sand, a fait accompli. He said, you know, a lift, that would work. Having practices on the first floor at Coughlin in the gym, that would work. Having practices on the first floor of Coughlin in the cafeteria, that would work. Or having practices at Solomon a few miles away, where he'd always had practices before, the other school, that would work. The answers were not, well, here's the alternative from the district. The district didn't suggest any other accommodation. They simply said, there aren't going, we're not going to do any of those things. We're not going to do any of those things. So the issue then becomes, you know, what was his understanding? That's all well and good in June. And then in August, after he makes those accommodation requests, then they appoint the co-coach. Then they appoint the assistant coach, who had spoken out against him on the basis of his disability, at a public meeting. So when you get to August 28th, you know, the fact that he was unaware of any efforts that were supposedly made by the district, and as a matter of record, that's what Mr. Cristano said, that that day, he wanted to talk to Mr. Bellis about those prospects, and had hoped to have a presentation, but he never told him that. That's only the frosting on the cake. That's only the final moment. You're not answering the judge's question, which is, why is his lack of knowledge, or is his lack of knowledge relevant? I'm sorry. It is relevant. I'm not saying that's sufficient. I'm saying it's relevant. It's part of the total context. Because if he had known, if he had known, that would certainly be in the district's favor. Well, let's change the topic. Isn't our inquiry whether there was discrimination occurred here? And it really seems like, it's difficult to wrap my mind around, frankly. You know, whether they discriminated is based upon whether your client knew what they were doing. I don't know. Well, I think the element, the elements, of course, are discrimination, failure to accommodate, retaliation, and hostile work environment. And the element of discrimination here is he was treated differently in terms of the appointment of the co-coaches and the way that they dealt with him generally on account of his disability. They're inextricably connected. But the real important point is he asked for accommodations. He asked for something that would enable him to do that practice work. And that wasn't forthcoming. So, you know, they don't, they're not all standalone. The same evidence supports all theories. This is not a situation where the discrimination theory can be separated out entirely from the context of what he needed to be able to do his job. Well, let me ask you this. In order for you to succeed on your reasonable accommodation claim, one of the things you're, I think, going to have to convince us is that there was an unreasonable delay in providing the accommodation. We know that between May and August, it's not wrestling season. Right? There was nothing that was being done by the district at all during that time. I apologize. That's okay. There was nothing being done at that time at all. Hold on a second. Hold on a second. Sure. Hold on, counsel. Judge Greenway is asking a question. Yeah. Is the phone issue resolved now? Yes, it is. Okay, great. So let me finish. That was the alarm for the time. My apologies, Your Honor. No worries. We'll give you some more time. And you're on our time now. So it's all good. We're going to have all the time we need. Here's the problem. In order for this to work for you, this has to be an unreasonable delay. And I do want to get back to the point about knowledge that Judge Chigares brought up. We're talking about May to August. From your standpoint, no reasonable accommodation has been made. But it's not the season. He doesn't need access to the gym at this point because he's not doing anything with the athletes. Am I wrong about that based on what's in the record? I hesitate to ever address a judge and say that a judge is wrong about anything. But I think the important point is laid out in reply brief, page 7, where we talk about all the things that the head varsity wrestling coach does during the summer. We talked about how he had scheduled clinics or requested the opportunity to schedule clinics during the summer to get a head start on the season. And the board didn't do that, but he needed facilities to accomplish that. The testimony from the other parties involved, all the deposition testimony was the same, that it's a 12-month-a-year position, they're always busy doing that. Did he need access to the wrestling room at that particular time? He did to have the clinics if that's where they were going to run. But we get to the point where there's only 67 days from August 28th until the beginning of wrestling season in 2014. And nothing, no affirmative steps have been taken whatsoever by the district. So are we to totally disregard the fact that they had made an appointment or whatever the exact fact is for the lift? The first time that there's any evidence that that would have happened is August 25th. That's the first step that any effort could possibly have been taken. Fabulous. So is your point that that should be disregarded with regard to accommodations? Sorry, Your Honor. It has to be placed in the proper context. First of all, is it possible that that could even have been accomplished by the time the wrestling season takes place? The district puts forth no evidence to that. Well, that's speculation, right? You've got to put that aside. Well, the question becomes the need for an interactive process is a mutual need. It's a mutual process. So the burden of proof on reasonable accommodations, sure, that's on the plaintiff. But the idea of what is a sufficient interactive process, that's mutual. So the fact is they didn't do a single thing except appoint assistant coaches. What are we to do with the fact that it was August 28th? I'm sorry, August 25th that they started this process and your client doesn't know about it on August 28th. There was supposed to be a meeting of some sort on the 28th and he, from their standpoint and from the record, it would appear he initiated the decision to resign and acted on it on August 28th. Now, earlier in your presentation you said he was forced out but if he resigns on the 28th and they're making these steps on the 25th and the 28th that seems to be in tension with regard to whether he was forced out. It might be. It's a question of good faith. I think that's a jury question. First, let me say that it has nothing to do with the adverse action on August 11th and the demotion. So that if that is a demotion then we have established that and we should go to trial on that issue alone. Second, the idea that they begin a process or represent they've begun a process on August 28th has to be put in context with the last thing he heard was from the superintendent of the district that they would not pay for a lift. So that's context as well in terms of his state of mind. The next thing he hears is he's not singular head coach anymore. He is now a co-coach and his authority is completely diminished by comparison to his ability to make decisions. So on August 28th he's confronted with the text messages which do not state the reason for the text messages except, you know, you've got emails. I know your email doesn't work according to Mr. Castano. I know that. I'm not telling you what this is about. So he's called down to the office to essentially have a telephone conference with Mr. Castano and he says, I'm out. I'm done. What does Mr. Castano do? And this goes to the question of good faith and this goes to the question of intent. Mr. Castano doesn't say, oh wait a minute don't resign. You know, we're going to try to work this out. Instead he says, here's what you need to write in your resignation letter and please do it right now. Three times that day you know, Mr. Castano to himself or Mr. Waloski, the principal, says get me that letter, get me that letter. To ascribe to that. When your client initiated it what do we do ascribe to Mr. Castano's whatever you want to say, encouragement to do what your client said he wanted to do. I think that's a jury question. I think the issue at that point becomes what would a reasonable juror react to all the circumstances that come into evidence about Mr. Waloski's circumstances when he said, I've got an important you need to talk to me, here's two text messages. I'm not going to tell you the text messages what they're about but here they are. And so a juror is allowed to say that's not a good faith especially when the reaction is a celebratory reaction and a good you're done, you're out, now we don't have to deal with you anymore. That is as reasonable a conclusion to be drawn as any other. There's no reason to infringe. The problem is again that he didn't know all the facts and you're asking us to view this whole case according to his perspective only and that's isn't that problematic? I know you've answered it but your time is pretty much up but I want to ask you something else related to what Judge Greenaway was asking. You're talking about context you're also talking about that this is summertime in a school and that's something I suppose that we need to consider. It was not teaming with people and is there anything in the record as to whether teams student athletes were even allowed in the school during the summertime? What's in the record on the issue of the 12 month service of a varsity coach is in my reply brief at page 7 which is that everyone is engaged in the work That's not what's on page 7. I'm looking at page 7 right now. I understand that but no there isn't anything in the record as to who's using what facilities at that particular moment but the school starts right then and it's only 67 days until the start of the wrestling season and the entire context would be that there's very good reason for Mr. Bellis to question whether or not any of this could have been accomplished even if he had known it. He doesn't know apparently one fact that isn't necessarily not in context but the sincerity of it He doesn't know that. He knows everything else about it I'm asking you about something pretty specific I'm asking you really about what you complained that he wanted to do clinics Is there anything in the record that says they didn't respond affirmatively. That's pretty clear. Could that even have happened? It's summertime Are student-athletes even allowed in the school? That's really what I'm asking. Is there anything in the record about that? I think the presumption there has to be in favor of Mr. Bellis that the application for clinics and also what you saw with the coaching by the other assistants in the course of that year that's being done. Whether it's done at the school or not I don't think the case of the summary judgment motion doesn't turn on whether or not in July and August the wrestling room could have been used by anybody else or by Mr. Bellis I don't think there's record evidence of that. We don't rely on that All right. Well, counsel, we're going to have to move on We've gone pretty far We'll hear you on rebuttal and we'll hear from your adversary now. Thank you Thank you very much Good morning, Your Honor. My name is Brian Taylor I'm special counsel to the district as well as trial counsel in this case The school district's position is that we contend that obviously the district court correctly reviewed plaintiff's evidence and found it to be lacking as to plaintiff's ADA and PHRA claims I think the problem is twofold in which the district court correctly pointed out Number one, there was a complete lack of evidence offered by the plaintiff. For instance the plaintiff is asking us to rely purely upon his speculation as to what may have happened and what was in people's minds as well as conjecture There were no other witnesses offered. There were two or three texts that don't support his allegations There were no affidavits, depositions admissions, documents, policies demonstrative evidence The whole case relied purely upon his perception of how he was being treated The second issue which the district court correctly pointed out is the plaintiff's appeal relies primarily upon pointing out disputed facts. Disputed facts aren't necessarily material facts which should be presented to a jury Let's speak to one counsel that may in fact fall within the ambit of what you're talking about and that is demotion whether it was a demotion or not We agree that that could be at least theoretically a disputed fact, right? Correct Here's my question You get the answer after I give the question. Here's the question When you look at this action by the board of co-coach co-head coach How can you argue that's not a demotion, right? Now, let me set the table for a moment Nick Saban is the head coach of if the trustees of the University of Alabama appointed a co-head coach Would that not be a demotion to Nick Saban? Let's bring it home. You're trial counsel. If out of the blue they appointed co-trial counsel would that not be a diminution in your responsibilities? Not necessarily, depending upon how we of the litigation. That may not be at all I mean, welcome the assistance of the counsel. I think you have to look at the fact that the PIAA doesn't set forth this concept of a diminution or co-coaching. There's no school policy that said having an assistant coach appointed with a demotion of the primary coach. As well as your honor pointed out, there was no diminution in salary, overall responsibility If anything, the arrangement was such that he would be in charge of the whole program. In fact, it's arguable that was a promotion in charge of the whole wrestling program there. Also, if you look at the individuals that were appointed or that he claims he wanted appointed to be assistant coaches with him one chose not to apply the second individual was later rejected because he was unqualified and the other gentleman there was some issue unrelated to Mr. Bell's selection. These coaches were not denying him. There were other reasons why they were not selected. There's no proof that it was intended to be a diminution in any way. I handle many employment cases. I will get a PIAA professional to testify and to explain. Well, this is the organization and structure of high school sports and this is the effect of having an assistant coach co-equal with you would have had an effect. There was no such evidence presented for a jury to consider that. Again, we're relying upon Mr. Bell's perception of what he was being offered and he was unhappy with it. That doesn't mean that... Counselor, who came up with the term co-coach? Did the school district say you are a co-coach now? I would have to go back. I believe Mr. Castano presented it as a coach of the whole program. More than so much as a co-coach. It was intended to be an elevation, a supervisory position over the entire program. Did Mr. Parsonak ever occupy that position of co-head coach before August 28th? I do not believe so, Your Honor, but I cannot say for certain. I don't want to say otherwise. Go ahead. I just want to segue. There was some discussion about Mr. Hawkins, the gentleman who spoke out. I think the court needs to bear in mind regarding the hostile work environment. There were three people who complained, three groups of people complained. Mr. Hawkins was the assistant coach. He was a parent and a volunteer coach. He was not an agent or representative of administration or the district. You had complaints from students who, again, they're not agents of the district. There were three students that were identified. Two, Mr. Bells couldn't identify the students, and as to the third student, he admitted that students' comments weren't harassing or creating a hostile environment. The third group of complainants were the general public. Again, none of these groups are representatives of the agents, representative or agents of the district, and their opposition to his appointment should not be attributed to the district. Yeah, but the problem is that Hawkins, who complained about him, I get that. He's not a supervisor. He's not in a position to make a decision. And yet, they hire him to be Bells' assistant coach. Isn't that problematic? Well, no. As being against this coach, you're going to buddy him up with the head coach now? Well, I think the focus is on hiring a staff that's best for the students and getting them a number of coaches. And I think there's a lot of animosity between Mr. Bells and Mr. Hawkins. We're just trying to get a qualified coaching staff. Added with the fact that the ultimate selection of coaches is done by the school board. They have the final say. I want to talk to you for a moment, or talk with you, I should say, not to you, about unreasonable delay. It's a focus of the argument of Appellant. I went and looked back at the Appellant's reply brief and there's a mention on page nine of the fact that Mr. Bells was going to apply to have summer programs. There's no assertion that it happened. Talk to me about that time between May and August and what our analysis should be on unreasonable delay. Sure, Your Honor. I believe he was appointed May 12th or 13th, somewhere along the lines, but between May 14th when he met with Mr. Castano and so August 28th when we had arranged a meeting for him for the chair lift, I count that there were at least three meetings. Across me, Your Honor. There were three meetings among all the administrators. Two of them included Mr. Bells. There was a contact, two emails to Mr. Bells advising him that the district was active in trying to arrange the accommodation. Ultimately, the accommodation he chose for him was the one he indicated that had been very successful in the past and that was a chair, the chair lift. There was a call to the company that he had specifically said had worked before for him in the past. It turned out that chair company could not do it. We then went to a second chair company. That appointment was scheduled the exact day that he was determined that he resigned. So there was significant effort on the part of the district to accommodate him. Added with the fact that the ADA does not set a predefined time period which to institute the accommodation. Most importantly, as Your Honor pointed out, this happened, his election was in May. He resigned in August. So we had all these meetings during the summer in between. The season by PIA has a defined season in Pennsylvania. It defines the first day and the last day of the season. The first day of the season isn't until November. So we had months where the school was actively taking steps to find an accommodation with him. Just one follow-up. I don't want to interrupt Judge Shigaris. But you noted the meetings and obviously we've heard about the emails, etc. The meetings that you allude to and the presence of Mr. Bells at those meetings, that's all in the record, yes? Yes, it is, Your Honor. So there were multiple meetings and like I said, ultimately the district chose his preferred accommodation and we were taking steps to do so. He aborted the process by resigning on the very day that we had set up the meeting with the company who we believed could have this lift installed and which would have made it reasonably accommodable for him and give him the provided access that he needed. I asked your adversary, is the school even open in the summer for clinics? I don't want to represent that. That's okay. I don't want to represent that, it is. Okay, fine. And also you talked about there's a definite bright line it's November 1st, I think you said? Yes, PIA it's in the Constitution and bylaws. There's a defined season where technically you're not supposed to have certain amount of practices, certain amount of players, certain amount of hours before the season starts. We were months away before the start of the season. There was ample opportunity for us to still, even if we started August 29th, the day of the meeting with him, we would have had ample time to have it fully accessible for him. We were never given that opportunity. But I guess what I'm getting at here is could a clinic even have occurred on school property? Would that have been violative of the Pennsylvania rules? I imagine he could have set up some kind of informal maybe scrimmage practice, but I don't think there's any notes in the record where he approached administration and said, look, on this date I would like to have a clinic. Is there some kind of way that you could give me a different facility in the district? And we would have looked into it. There's no record of that request being made. Okay. Because I think in Jersey, my kids played sports, and I think you couldn't do things before your season started. Otherwise, that would be a violation. But that's neither here nor there. The PIAA Constitution reads pretty harsh about the deadlines. It's bold printed. The defined season is. Okay. I think you still have some time if you want to move to some other areas. Sure. Actually, I think I've covered, because you brought up most of the issues I was going to cover. Just going back to retaliation for a quick second, there was an issue about we retaliated in terms of fingerprints. Again, if you look at the record, Mr. Belz was the only single employee who did not get his fingerprints timely by the law required in Pennsylvania Child Protective Services law. If anything, the school bent over backwards to accommodate him. We let him teach without having all his fingerprints on file. That was an area that was fully developed during discovery, which turns out is indicative of any retaliation that we've done regarding him. Can I ask you, you brought up a point about at the very end of the employment relationship, how his client went in to resign and immediately the response was put it in writing and they repeated it. He puts significant weight on that, that it was celebrated as opposed to something else. What is your position on that in its significance? Sorry, Your Honor. My position, if you read the contents of the text, you will see there's no request for a resignation. And if anything, I believe the plaintiff admits in his testimony, I assumed I was being fired, so I resigned. He was not told that he was being resigned. He jumped the gun. And if anything, I don't believe that the ADA requires us to dispel a plaintiff if they are incorrect  I assumed I was in trouble, so I resigned. There's no requirement that we dispel mistaken notions of what's going to happen next. He had a duty to come in, meet with Mr. Castano, and explain to him why am I here. And we would have explained to him, even if he had gotten an email, because we have a Lyft company coming in about an hour that we need you to meet with. Well, I think he went a little further. I think he said in counsel's words, and I might be getting it wrong, but it was essentially celebrated saying, okay, put it in writing. And they repeated that a couple of times. Is that as significant? No. That may be counsel's interpretation. I serve as general counsel for about 60 different school districts. Oftentimes, they will come and say I want to resign or retire for whatever reason. I'll say, okay, you have to put it in writing so I can forward it to the board. That's not necessarily a celebration. It's a matter of following procedure. I need a resignation on file that's written off and signed by the employee. Okay. Anything more, counsel? Just in summary, our basic position is I think the evidence, whether it's written evidence, whether it's testimonial evidence, will show that we actively engaged in the interactive process. Unfortunately, he just happens to resign on the day in which we thought we had the final solution. And the fact that he didn't get other options he may have mentioned, the interactive process doesn't require that we give the preferred method. It requires that we reach a method that works for both. For instance, one of his options was that we do it in the cafeteria. That causes a conflict because we'd have to move out hundreds of tables and chairs to provide that specific combination. We're not required to give every option that is offered. In this sense, we feel we gave him the option that was previously successful for him, that he asked for. He even gave us the name of the company. We contacted the specific company which he advised us of. So we took every step in that regard. Can I ask you one other question? Maybe I'm remembering this from a past case, but in terms of the discrimination claim, is it significant that they knew he had a disability when he was hired? As a matter of fact, he'd been with the district for many, many years. Obviously, they knew. I think it's significant to the extent that the evidence is clear to all the testimonies that we're giving that he was hired over three or four other people who were non-disabled. We recognize that he was talented and skilled and no one's ever disputed that. In fact, we hired him despite this was fully known to all of us. I think that takes our commitment to hiring him and keeping him back from the inception of his appointment. Okay. Judge Greenaway, do you have anything more? No. Thank you, sir. Okay. Judge Nygaard, do you have anything? I have nothing. Thank you. Okay. Thank you. We thank you, counsel. And we'll hear now rebuttal. Thank you, Your Honor. Let me start with the text on August 28th. The texts that Mr. Castano sent to Mr. Bellis. Can you please email me what we talked about this morning? That was at 11.29 and he did it again at mid-afternoon. That's at the appendix 183A and 184A. Again, he immediately said do it and dictated what the content should be. There were three meetings in the summer between Mr. Bellis and various members of the administration. None of which involved accommodations. The reason, and this comes from the testimony of the district itself, the reason given by Superintendent Prabhu's for having the meeting was he felt that Mr. Bellis was under some stress. At none of those meetings did the district suggest any accommodations themselves. The accommodation that you're talking about in terms of the lift, we did suggest a lift, but Mr. Bellis' only prior experience with the lift was none. The evidence was that he knew someone who had no follow-up from the district. With respect to whether, I want to be clear, the clinics were not necessarily for practice purposes for the varsity team. They were to be held at Solomon. They were to establish it was a 12-month-a-year job and that's what we've represented in our brief. We're not saying that the clinics would have taken place in the wrestling room at Copland. It was for a different issue. The issue, too, is the August 11th action did not relate to the things that Mr. Castano had talked about, about giving Mr. Bellis benefits. The CEO idea, the floating coach idea, being a junior high coach idea, none of that ever happened. Only thing that happened on August 11th was that Mr. Parsnick was made a co-coach. There is no dispute in the record about what was said on May 14th by Mr. Castano to Mr. Bellis, and that is, why don't you not be the coach? Why don't you be the CEO? Why don't you be a floater? Those were all direct suggestions that he withdrew from being the head coach. What happened on August 11th, none of those things came up except the addition of Mr. Parsnick to that co-coach position. That's the point. There was no suggestion that this was enhancing Mr. Bellis' position whatsoever, and it wasn't. The key thing here is if you look back to May 14th, the very first thing that happened that was never, ever withdrawn was Mr. Castano, the director of human resources for the district, and a wrestling volunteer coach said, why don't you quit? We think you should quit. Things have changed. That's what happened. Nothing changed from that point forward. It was swimming upstream all the way. The idea about the length of the accommodation, Judge Shigeru, I think you're correct. There can't be practices before the practice season begins. That's true. That's not really our argument. The idea that no effort was made toward any accommodation for 108 days is the issue in context. It's not that by itself in isolation that this case is based on. It's based on all the other things that happened. That's a piece of it. That's a piece of it. If the district come back and look, we talked to him, we set these things up in June or July and August and we had these ideas and we planned these things. They never suggested a single solitary accommodation. That's just one piece of the overall context of why it was reasonable for him to have done what he did on August 28th. August 11th, I'm sorry. Could you just give me the date that you say Mr. Castano said, why don't you quit? May 14th. I think the appointment, and I'm going to go back to my timeline. I'm sorry, May 13th. He was appointed on May 12th and Mr. Castano visited him the very next day. The testimonial record is laid out in our brief exactly what was said, which is one of my concerns about the court below, saying that they were consistent, Mr. Castano's version and Mr. Bellis' version. They were not consistent. There was clear recollection of the testimony by Mr. Bellis that he suggested to become a floater, go back to the junior high, or be a CEO. All right, counsel. Judge Green, did you have something else? No, I have nothing. All righty. Judge Nygaard, do you have anything? I have nothing. Thank you. Okay, thank you. We'd like to thank all counsel, both counsel. They're excellent briefs and they're excellent argument today. We'll take the case under advisement and thank counsel again, and I'm sorry we couldn't see each other in person, but Zoom's the best we can do here. So, hope our paths cross again and I'll ask the clerk to adjourn court.